**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

REGINA S. BELANGIA,

       Plaintiff,

v.                                               Case No. 3:18-cv-425-J-JRK

ANDREW M. SAUL,[1]
Commissioner of Social Security,

       Defendant.
_____

## OPINION AND ORDER[2]

### I. Status

Regina S. Belangia ("Plaintiff") is appealing the Commissioner of the Social Security Administration's ("SSA('s)") final decision denying her claim for disability income benefits ("DIB"). Plaintiff's alleged inability to work is the result of acid reflux, "weight bearing joints," a vision impairment, osteoarthritis, fibromyalgia, and depression. See Transcript of Administrative Proceedings (Doc. No. 10; "Tr." or "administrative transcript"), filed June 21, 2018, at 83-84, 94, 191 (emphasis omitted). Plaintiff filed an application for DIB on August 8, 2013,[3] alleging a disability onset date of January 1, 2012. Tr. at 170. The application

---

    [1]    Andrew M. Saul became the Commissioner of Social Security on June 17, 2019. Pursuant to Rule 25(d)(1), Federal Rules of Civil Procedure, Andrew M. Saul should be substituted for Nancy A. Berryhill as Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

    [2]    The parties consented to the exercise of jurisdiction by a United States Magistrate Judge. See Notice, Consent, and Reference of a Civil Action to a Magistrate Judge (Doc. No. 9), filed June 21, 2018; Reference Order (Doc. No. 13), entered June 26, 2018.

    [3]    Although actually completed on August 8, 2013, see Tr. at 170, the protective filing date of the DIB application is listed elsewhere in the administrative transcript as August 7, 2013, see, e.g., Tr. at 83, 94.

was denied initially, Tr. at 83-90, 92, 114-16, and upon reconsideration, Tr. at 93, 94-110, 111, 118-22.

On January 11, 2016, an Administrative Law Judge ("ALJ") held a hearing, during which she heard testimony from Plaintiff, who was represented by counsel, and a vocational expert ("VE"). Tr. at 45-81. Plaintiff was fifty-one years old at the time of the hearing. See Tr. at 83 (indicating date of birth). The ALJ issued a Decision on February 24, 2016, finding Plaintiff not disabled through the date last insured. Tr. at 25-37.

Thereafter, Plaintiff requested review of the Decision by the Appeals Council. See Tr. at 19. The Appeals Council received additional evidence in the form of a brief authored by Plaintiff's counsel and medical records. Tr. at 8, 9; see Tr. at 246-47 (brief); Tr. at 404-05 (medical records). On April 25, 2017, the Appeals Council denied Plaintiff's request for review, Tr. at 4-7, thereby making the ALJ's Decision the final decision of the Commissioner. On September 18, 2017, the Appeals Council denied Plaintiff's request to reopen and change the Decision. Tr. at 2-3. On March 30, 2018, Plaintiff commenced this action under 42 U.S.C. § 405(g) by timely filing a Complaint (Doc. No. 1), seeking judicial review of the Commissioner's final decision.

On appeal, Plaintiff makes the following arguments: 1) "[t]he Commissioner failed to articulate good cause for not crediting the opinion of Dr. [Christopher] Potter, the treating neurologist, and further failed to understand the nature of myotonic dystrophy and its symptoms"; and 2) "[t]he Commissioner erred in assigning significant weight to the nonexamining physician, [Dr. Reuben Brigety], at reconsideration that was issued prior to the time that [Plaintiff] was diagnosed with myotonic dystrophy." Plaintiff's Amended Brief

(Doc. No. 18; "Pl.'s Br."), filed August 28, 2018,[4] at 1, 8, 18 (emphasis omitted); see Pl.'s Br. at 8-18 (first argument), 18-21 (second argument). On November 2, 2018, Defendant filed a Memorandum in Support of the Commissioner ("Def.'s Mem.") addressing Plaintiff's arguments. After a thorough review of the entire record and consideration of the parties' respective memoranda, the undersigned finds that the Commissioner's final decision is due to be affirmed.

## II. The ALJ's Decision

When determining whether an individual is disabled,[5] an ALJ must follow the five-step sequential inquiry set forth in the Code of Federal Regulations ("Regulations"), determining as appropriate whether the claimant (1) is currently employed or engaging in substantial gainful activity; (2) has a severe impairment; (3) has an impairment or combination of impairments that meets or medically equals one listed in the Regulations; (4) can perform past relevant work; and (5) retains the ability to perform any work in the national economy. 20 C.F.R. §§ 404.1520, 416.920; see also Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004). The claimant bears the burden of persuasion through step four, and at step five, the burden shifts to the Commissioner. Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

---

[4] Plaintiff amended her initial brief (Doc. No. 17), filed August 28, 2019, only to attach an exhibit.

[5] "Disability" is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

Here, the ALJ followed the five-step sequential inquiry. See Tr. at 27-37. At step one, the ALJ found that Plaintiff "did not engage in substantial gainful activity during the period of her alleged onset date of January 1, 2012 through her date last insured on June 30, 2014." Tr. at 27 (emphasis and citation omitted). The ALJ found at step two that Plaintiff "had the following severe impairments: myotonic dystrophy, anxiety disorder NOS, bilateral knee osteoarthritis ('OA'), fibromyalgia ('FM'), [and] depression NOS." Tr. at 27 (emphasis and citation omitted). At step three, the ALJ concluded that Plaintiff "did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 [C.F.R.] Part 404, Subpart P, Appendix 1." Tr. at 28 (emphasis and citation omitted).

The ALJ determined that through the date last insured, Plaintiff had the following residual functional capacity ("RFC"):

> [Plaintiff could] perform light work as defined in 20 [C.F.R. §] 404.1567(b) except she was limited to occasional climbing of ladders, ropes, scaffolds, ramps, or stairs. She was limited to occasional balancing. She could frequently stoop, kneel, crouch, and crawl. She had to avoid concentrated use of moving machinery and concentrated exposure to unprotected heights. Work was limited to simple, routine, and repetitive tasks with only occasional interaction with the public and coworkers, and only occasional supervision.

Tr. at 29 (emphasis omitted).

At step four, the ALJ relied on the testimony of the VE and found that "[t]hrough the date last insured, [Plaintiff] was unable to perform any past relevant work." Tr. at 36 (emphasis and citation omitted). At step five, after considering Plaintiff's age ("49 years old . . . on the date last insured"), education ("at least a high school education"), work experience, and RFC, the ALJ relied again on the testimony of the VE and found that

"[t]hrough the date last insured, . . . there were jobs that existed in significant numbers in the national economy that [Plaintiff] could have performed," Tr. at 36 (emphasis and citation omitted), such as "Marker," "Sub Assembler," and "Mail Clerk," Tr. at 37. The ALJ concluded that Plaintiff "was not under a disability . . . at any time from January 1, 2012, the alleged onset date, through June 30, 2014, the date last insured." Tr. at 37 (emphasis and citation omitted).

### III. Standard of Review

This Court reviews the Commissioner's final decision as to disability pursuant to 42 U.S.C. § 405(g). Although no deference is given to the ALJ's conclusions of law, findings of fact "are conclusive if . . . supported by 'substantial evidence.'" Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998)). "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'" Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987)). The substantial evidence standard is met when there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Falge, 150 F.3d at 1322 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). It is not for this Court to reweigh the evidence; rather, the entire record is reviewed to determine whether "the decision reached is reasonable and supported by substantial evidence." Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991) (citation omitted). The decision reached by the Commissioner must be affirmed if it is supported by substantial evidence—even if the evidence preponderates against the Commissioner's

findings. Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158-59 (11th Cir. 2004) (per curiam).

## IV. Discussion

As noted, Plaintiff makes the following arguments: 1) the ALJ erred in evaluating Dr. Potter's opinion and failed to understand the nature of myotonic dystrophy; and 2) the ALJ erred in evaluating the opinion of Dr. Brigety, the nonexamining physician who reviewed the evidence at the reconsideration level. The undersigned sets out the parties' arguments and the applicable law. Then, the issues raised are addressed.

**A. Parties' Arguments**

Plaintiff first contends that "[t]he ALJ grossly oversimplified a very complicated medical condition and erroneously failed to articulate good cause for not accepting Dr. Potter's opinions as far as upper extremity limitations prior to [Plaintiff's] insured status expiring." Pl.'s Br. at 17. According to Plaintiff, "Dr. Potter indicated and the medical literature also indicates that myotonic dystrophy is progressive." Id. at 12. Plaintiff notes that "prior to [Plaintiff's] insured status expiring, Dr. Potter examined her on multiple occasions during which time he worked to determine the etiology of her symptoms." Id. at 13. Plaintiff argues that "the ALJ's claim that her medical condition was satisfactorily managed has no basis in fact" because Plaintiff's "condition did not improve and will not improve." Id. at 15. Plaintiff contends that "the ALJ's reliance on isolated activities [to reject Dr. Potter's opinions] was misplaced and [the ALJ] also overstated the extent of [Plaintiff's] activities." Id.

Second, as to Dr. Brigety, Plaintiff asserts his opinion "was based on a lack of knowledge regarding [Plaintiff's] ultimate diagnosis" of myotonic dystrophy because Dr. Brigety did not have Dr. Potter's records regarding Plaintiff's myotonic dystrophy at the time he rendered his opinion. Id. at 20. Plaintiff argues that "[t]he ALJ's reliance on an outdated opinion from a reviewing obstetrician over that of a treating neurologist who relied on extensive testing was clear reversible error." Id. at 21.

Responding to Plaintiff's contention regarding Dr. Potter's opinions and Plaintiff's myotonic dystrophy, Defendant asserts that this argument "essentially equates [Plaintiff's] diagnosis of myotonic dystrophy with necessarily being disabled." Def.'s Mem. at 6 (citations omitted). According to Defendant, "Plaintiff failed to show that her impairments, including myotonic dystrophy, imposed limitations on her ability to work beyond the limitations found by the ALJ." Id. at 7 (citations omitted). As to Plaintiff's contention regarding Dr. Brigety, Defendant argues that "the evidence did not establish that myotonic dystrophy caused greater physical limitations than the ALJ assessed in the RFC finding, regardless of the condition that caused them." Id. at 17. According to Defendant, "while Dr. Brige[ty] did not have all of the evidence before him, he considered the bulk of the evidence that predated Plaintiff's date last insured; additionally, the ALJ considered all of the evidence of record and supported [her] RFC finding by reference to the evidence as a whole, including Plaintiff's testimony, as well as the medical evidence and opinion evidence." Id. at 17-18.

**B. Applicable Law**

The Regulations[6] establish a "hierarchy" among medical opinions[7] that provides a framework for determining the weight afforded each medical opinion: "[g]enerally, the opinions of examining physicians are given more weight than those of non-examining physicians[;] treating physicians[' opinions] are given more weight than [non-treating physicians;] and the opinions of specialists are given more weight on issues within the area of expertise than those of non-specialists." McNamee v. Soc. Sec. Admin., 164 F. App'x 919, 923 (11th Cir. 2006) (citing 20 C.F.R. § 404.1527(d)(1), (2), (5) (2006)). The following factors are relevant in determining the weight to be given to a physician's opinion: (1) the "[l]ength of the treatment relationship and the frequency of examination"; (2) the "[n]ature and extent of [any] treatment relationship"; (3) "[s]upportability"; (4) "[c]onsistency" with other medical evidence in the record; and (5) "[s]pecialization." 20 C.F.R. §§ 404.1527(c)(2)-(5), 416.927(c)(2)-(5); see also 20 C.F.R. §§ 404.1527(f), 416.927(f).

---

[6] As noted, the SSA revised the rules regarding the evaluation of medical evidence and symptoms for claims filed on or after March 27, 2017. See Revisions, 82 Fed. Reg. 5844-01, 5844. Because Plaintiff filed her claim before that date, the undersigned cites the rules and Regulations applicable to Plaintiff's claim, unless otherwise noted.

[7] "Medical opinions are statements from physicians or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1); see also 20 C.F.R. § 404.1502 (defining "[a]cceptable medical sources"); 20 C.F.R. § 404.1513(a).

With regard to a treating physician,[8] the Regulations instruct ALJs how to properly weigh such a medical opinion. See 20 C.F.R. § 404.1527(c)(2). Because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)," a treating physician's medical opinion is to be afforded controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. Id. When a treating physician's medical opinion is not due controlling weight, the ALJ must determine the appropriate weight it should be given by considering the factors identified above (the length of treatment, the frequency of examination, the nature and extent of the treatment relationship, as well as the supportability of the opinion, its consistency with the other evidence, and the specialization of the physician). Id.

If an ALJ concludes the medical opinion of a treating physician should be given less than substantial or considerable weight, he or she must clearly articulate reasons showing "good cause" for discounting it. Schink v. Comm'r of Soc. Sec., — F.3d —, No. 17-14992, 2019 WL 4023639, at *7 (11th Cir. Aug. 27, 2019); Hargress v. Soc. Sec. Admin., Comm'r, 883 F.3d 1302, 1305 (11th Cir. 2018) (citation omitted); Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause exists when (1) the opinion is not bolstered by the

---

[8] A treating physician is a physician who provides medical treatment or evaluation to the claimant and who has, or has had, an ongoing treatment relationship with the claimant, as established by medical evidence showing that the claimant sees or has seen the physician with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for the medical condition. See 20 C.F.R. § 404.1502.

evidence; (2) the evidence supports a contrary finding; or (3) the opinion is conclusory or inconsistent with the treating physician's own medical records. Schink, 2019 WL 4023639, at *7; Hargress, 883 F.3d at 1305 (citation omitted); Phillips, 357 F.3d at 1240-41; see also Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991); Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987) (stating that a treating physician's medical opinion may be discounted when it is not accompanied by objective medical evidence).

An ALJ is required to consider every medical opinion. See 20 C.F.R. §§ 404.1527(c), 416.927(c) (stating that "[r]egardless of its source, we will evaluate every medical opinion we receive"). While "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion," Oldham v. Schweiker, 660 F.2d 1078, 1084 (5th Cir. 1981) (citation omitted); see also 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor," Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1179 (11th Cir. 2011) (citing Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir.1987)); Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005); Lewis, 125 F.3d at 1440.

**C. Opinions and Myotonic Dystrophy Diagnosis / Analysis**

**1. Dr. Potter's Opinions and Myotonic Dystrophy Diagnosis**

Dr. Potter is a physician at Baptist Neurology, who treated Plaintiff from January 2014 to October 2015, primarily for generalized pain and weakness. See Tr. at 306-08,

317-24, 329-31, 359-64; see also Tr. at 325-28, 383-88 (duplicates).[9] Dr. Potter diagnosed Plaintiff with myotonic dystrophy on November 4, 2014. Tr. at 320, 325 (duplicate). Dr. Potter completed three questionnaires containing opinions regarding the effects of Plaintiff's impairments on Plaintiff's ability to perform work-related functions. On November 25, 2015, Dr. Potter completed a Mental Health Questionnaire, stating Plaintiff's myotonic dystrophy affected to varying degrees her mental abilities and aptitude needed in any job. See Tr. at 367-69, 392-94 (duplicate). On December 2, 2015, Dr. Potter completed a Medical Opinion Re: Ability to Do Physical Activities ("Physical Activities Questionnaire"), see Tr. at 378-80, 396-98 (duplicate), and an Arthritis Questionnaire, see Tr. at 372-75, 400-03 (duplicate).[10] Plaintiff's argument is directed at Dr. Potter's opinions regarding the limitations associated with her upper extremities; as such, the Court focuses on the opinions regarding Plaintiff's physical limitations. These opinions are summarized below.

In the Physical Activities Questionnaire, Dr. Potter opined as follows. Plaintiff could walk only one city block without rest. Tr. at 378. She could continuously sit for thirty minutes and stand for fifteen minutes. Tr. at 378. In an eight-hour workday, Plaintiff could stand/walk for less than two hours and could sit for less than two hours. Tr. at 378. Plaintiff needed a job that permitted shifting positions at will from sitting, standing, and walking. Tr.

---

[9] The administrative transcript contains two treatment notes from Baptist Neurology (one dated January 24, 2014 and one dated February 10, 2014) that are not signed by Dr. Potter. See Tr. at 309-16.

[10] For ease of discussion, the undersigned does not cite the duplicates of the opinions in addressing Plaintiff's arguments below.

at 378. During an eight-hour workday, Plaintiff would sometimes need to take unscheduled breaks every thirty minutes that would last two hours. Tr. at 378-79.

Dr. Potter further opined that with prolonged sitting, Plaintiff's legs should be elevated at least to knee level, and if Plaintiff had a sedentary job, her legs should be elevated fifty percent of the day. Tr. at 379. Plaintiff did not need a cane or other assistive device while engaging in occasional standing/walking. Tr. at 379. In an eight-hour workday, she could never safely lift and carry anything; she could never bend, twist, stoop, crouch, climb stairs, or climb ladders; she could reach five percent of the time; she could grasp, turn, and twist objects five percent of the time; and she could never use her hands for fine manipulation. Tr. at 379-80. Plaintiff had significant limitations in doing repetitive reaching, handling, and fingering. Tr. at 379. Dr. Potter anticipated that on average Plaintiff would be absent from work more than twice a month as a result of her impairments or treatment. Tr. at 380.

In the Arthritis Questionnaire, Dr. Potter diagnosed Plaintiff with myotonic dystrophy. Tr. at 372. Dr. Potter stated that Plaintiff had reduced range of motion in the knees, hips, wrists, and fingers; joint instability; reduced grip strength; impaired sleep; tenderness; muscle weakness; muscle atrophy; and an abnormal gait. Tr. at 372. He opined that Plaintiff's pain is severe enough to frequently interfere with attention and concentration. Tr. at 372. According to Dr. Potter, Plaintiff was incapable of even "low stress jobs." Tr. at 373. Dr. Potter stated Plaintiff's medications may cause sedation. Tr. at 373. In addition, Dr. Potter provided the same opinions regarding Plaintiff's functional

limitations that he gave in the Physical Activities Questionnaire. Compare Tr. at 373-75, with Tr. at 378-80.[11]

Preliminarily, the Court notes that the fact that Plaintiff was diagnosed with myotonic dystrophy "does not reveal the extent to which [that impairment] limit[ed] her ability to work or undermine the ALJ's determination in that regard." Moore, 405 F.3d at 1213 n.6. As noted above, the ALJ found that myotonic dystrophy was a severe impairment, Tr. at 27, and in assessing Plaintiff's RFC, the ALJ properly incorporated the limitations caused by this impairment that are supported by the record. In doing so, the ALJ rejected the limitations opined by Dr. Potter. For the reasons stated below, the Court finds no error in the ALJ's evaluation of Dr. Potter's opinions. The ALJ summarized Dr. Potter's opinions, weighed them, and gave specific reasons for the weight given. These findings are discussed below.

The ALJ gave "no weight" to Dr. Potter's opined functional limitations on the ground that they are inconsistent with Plaintiff's own allegations of what she is able to do. Tr. at 34.[12] The ALJ stated, "[f]or example, Dr. Potter opined that [Plaintiff could not] lift or carry anything, which is inconsistent with [Plaintiff's] reports . . . and testimony that she can lift 5 pounds and her ability to shop for groceries and do laundry and other household chores."

---

[11] In the Mental Health Questionnaire, Dr. Potter opined that Plaintiff had poor or no ability to use public transportation or "perform at a consistent pace without an unreasonable number and length of rest periods." Tr. at 367-68. According to Dr. Potter, Plaintiff would likely be absent from work more than twice a month due to her impairments or treatment. Tr. at 369.

[12] It appears the ALJ referred to a separate "RFC" completed by Dr. Potter, but she was in fact referring to the functional limitations contained in the Physical Activities Questionnaire because she cited the exhibits containing that questionnaire (Exhibits 14F, 17F). Tr. at 34; see Tr. at 378-80 (Exhibit 14F), 396-98 (Exhibit 17F).

Tr. at 34 (citation omitted); see Tr. at 55,[13] 62-64 (testimony); Tr. at 203-05, 207 (Plaintiff's function report). As to Dr. Potter's opinion that Plaintiff could sit, stand, and walk for less than two hours total in an eight-hour workday, the ALJ observed that Plaintiff "did not allege the need to nap or lie down for naps during the remainder of the day." Tr. at 34; see generally Tr. at 48-74 (Plaintiff's testimony); Tr. at 200-01 (Plaintiff's supplemental pain questionnaire); Tr. at 202-09 (Plaintiff's function report). The ALJ noted that Dr. Potter's opinion that Plaintiff had poor/no ability to use public transportation and could not climb, bend, twist, or crouch is "not fully consistent with her level of functioning, including her ability to drive, fish from a boat, perform low intensity exercises, ambulate without a hand held assistive device, and perform household chores, which would indicate an ability to perform these tasks to some extent." Tr. at 34; see Tr. at 62-67 (testimony); Tr. at 200-01 (Plaintiff's supplemental pain questionnaire); Tr. at 203-05 (Plaintiff's function report); Tr. at 263 (September 2013 progress note indicating Plaintiff "joined the gym and has started upper body exercises"); Tr. at 317 (May 2014 progress note indicating Plaintiff "is doing some exercising on her own, high reps/low resistance").[14]

The ALJ gave "little weight" to Dr. Potter's opinions that Plaintiff had "difficulty with grip and use of her hands" and that Plaintiff could not "perform any job function where she

---

[13] Plaintiff testified that she could "[m]aybe" lift two pounds, see Tr. at 55, but in her Function Report she stated she could lift five pounds, see Tr. at 207.

[14] The ALJ properly relied on Plaintiff's reported daily activities. See 20 C.F.R. § 404.1529(c)(3)(i). Although it is true that a claimant's ability to perform "everyday activities of short duration, such as housework or fishing" is not sufficient on its own to disqualify a claimant from disability, see Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997), the ALJ considered those activities along with other factors. When combined with the medical evidence, Plaintiff's activities provided additional support for the ALJ's decision to reject Dr. Potter's opined limitations.

needed to grip or use her hands for any meaningful activity." Tr. at 35. The ALJ recognized that some treatment notes show decreased finger strength, see Tr. at 322, 327, 360, 363, but observed that others indicate Plaintiff otherwise had 5/5 motor strength in all four extremities and no peripheral synovitis, Tr. at 35; see Tr. at 264, 268, 269, 282, 311.

The ALJ accurately noted that "Plaintiff testified that her medication regimen has been simplified to Dexilant and Cymbalta, suggesting satisfactory management of her symptoms with her prescribed medication regimen." Tr. at 35; see Tr. at 73-74 (Plaintiff testifying that she no longer takes Tramadol or Phentermine and that she takes only Cymbalta and the generic version of Dexilant).[15] The ALJ also accurately noted that Plaintiff "has been capable of creating silk flower arrangements, fishing from a boat, washing, doing dishes, and driving, all of which require an ability to grasp and use her hands/fingers, and suggests no more than mild symptoms." Tr. at 35; see Tr. at 62-66 (testimony); Tr. at 200-01 (Plaintiff's supplemental pain questionnaire); Tr. at 203-05 (Plaintiff's function report).

In sum, the ALJ detailed the weight assigned to Dr. Potter's opinions, and she articulated specific reasons amounting to good cause for discounting the opinions. The ALJ properly considered Dr. Potter's opinions, and substantial evidence supports the ALJ's reasoning.

---

[15] Plaintiff testified she takes Dexilant for issues like acid reflux. Tr. at 54, 74.

### 2. Dr. Brigety's Opinions

As noted, Plaintiff argues the ALJ erred in giving significant weight to Dr. Brigety's opinions because they were rendered prior to Dr. Potter's diagnosis of myotonic dystrophy. See Pl.'s Br. at 18-21. The Court finds Plaintiff's argument unpersuasive. The ALJ's Decision makes clear that in assessing the RFC, the ALJ considered all of the evidence, including Dr. Potter's opinions and treatment notes regarding Plaintiff's myotonic dystrophy. See Tr. at 30-35. As noted by the ALJ, Dr. Brigety had the "bulk of the evidence from the treating sources and consultative examiners that . . . comprise the official record in this case," and "he considered all of the objective facts at the time he rendered his opinion." Tr. at 35.[16] Although Dr. Brigety did not have Dr. Potter's myotonic dystrophy diagnosis, the ALJ found that "the evidence in total does support in general the conclusions put forth by [Dr. Brigety]." Tr. at 35. The ALJ further explained that although Dr. Brigety "did not have at his disposal [Plaintiff's] testimony, that testimony, specifically as it relates to [Plaintiff's] activities of daily living, was consistent with [the doctor's opined limitations] to a significant degree." Tr. at 35. Moreover, as the ALJ appropriately assessed Dr. Potter's opinions, the ALJ did not err in assigning more weight to Dr. Brigety opinions on the basis that they are supported by the record as a whole. Tr. at 35; see Oldham, 660 F.2d at 1084 (finding the ALJ was justified in relying on a nonexamining physician's opinion that was consistent with the evidence, while rejecting a treating physician's opinion that was

---

[16] The ALJ did not refer to Dr. Brigety by name, but she cited the exhibit that contains his opinion (Exhibit 5A). Tr. at 35; see Tr. at 104-06 (portion of Exhibit 5A containing Dr. Brigety's opinion).

contrary to the evidence). The ALJ's finding in this regard is supported by substantial evidence and need not be disturbed.

## V. Conclusion

After a thorough review of the entire record, the undersigned finds that the ALJ's Decision is supported by substantial evidence. Accordingly, it is

**ORDERED**:

1. The Clerk of Court is directed to enter judgment pursuant to sentence four of 42 U.S.C. § 405(g) **AFFIRMING** the Commissioner's final decision.

2. The Clerk is further directed to close the file.

**DONE AND ORDERED** in Jacksonville, Florida on September 16, 2019.

*JAMES R. KLINDT*
United States Magistrate Judge

bhc
Copies to:
Counsel of Record